993 F.2d 883
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
MERCURY AIR GROUP, INC., Plaintiff-Appellee,
v.
INTERNATIONAL AIR LEASES, INC.; IAL Aircraft Holding; N304
Corporation; Aircraft Leasing, Inc.,
Defendants-Appellants.
MERCURY AIR GROUP, INC.; Plaintiff-Appellee,
v.
INTERNATIONAL AIR LEASES, INC.; IAL Aircraft Holding, Inc.,
N304 Corporation and Aircraft Leasing, Inc.;
Aircraft Leasing Inc.; XYZ
Corporations, Defendants,
St. Paul Fire & Marine Insurance Company, as Surety under
redelivery bond No. 400JF4466, Intervenor-Appellant.
 Nos. 91-16885, 91-16926.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 17, 1992.
Decided May 18, 1993.
 
 Before: GOODWIN, O'SCANNLAIN, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant International Air Leases posted a bond pursuant to a temporary restraining order. When IAL failed to comply with its terms, the district court ordered forfeiture of the bond. IAL and its surety, appellant St. Paul Fire & Marine Insurance Co., appeal.
 
 
 3
 * Air Specialties Corporation, doing business as Air America, owned a Rolls Royce RB-211 jet engine. In 1988, Air America granted security interests in the engine to both Mercury Air Group ("Mercury") and International Air Leases, Inc. ("IAL"). Mercury had the junior security interest, which secured a debt of approximately $1.1 million. It is not clear what the extent of IAL's security interest was, although Mercury contends that it was not worth more than $150,000.
 
 
 4
 In October of 1989, Air America filed a petition under Chapter 11 in bankruptcy court. In March of 1990, the case was converted to one under Chapter 7, and a trustee was appointed. In November of 1990, the bankruptcy court allowed the trustee to abandon the engine, turning it over to its creditors, Mercury and IAL. The bankruptcy court's order provided that IAL was not to fly the engine at any time before the resolution of the dispute between Mercury and IAL on the merits, and that before IAL could remove the engine from the airplane, it was to give Mercury five days written notice. The transcript of the hearing in bankruptcy court makes clear that the bankruptcy court contemplated that the dispute would be resolved in state court.
 
 
 5
 On May 15, 1991, Mercury filed a complaint in Arizona state court, seeking a declaratory judgment as to Mercury's interest in the engine, replevin of the engine and the QEC, damages for conversion, and an accounting of the indebtedness to IAL secured by IAL's lien on the engine.
 
 
 6
 On May 21, 1991, Mercury learned that IAL was preparing to fly the plane with the engine attached. Mercury filed an application for a temporary restraining order ("TRO") in state court, seeking to restrain IAL from flying the plane. The state court issued a TRO on May 21 that restrained IAL from flying the engine, but continued the hearing to the following day to consider IAL's offer to post a bond. On May 22, the state court issued a new TRO which prohibited IAL from flying the engine, including the QEC, but provided for suspension of the TRO if IAL posted a $1.5 million dollar bond. The TRO provided that if IAL elected to post the bond and fly the plane with the engine attached, but failed to return the engine in its entirety by June 3, 1991, the bond would be forfeited in full.
 
 
 7
 IAL contacted St. Paul Fire & Marine Insurance Co. ("St. Paul") on May 21 to inquire about a bond. On May 22, IAL's agent sent a copy of an undated and unsigned TRO to St. Paul. The draft order apparently contained no language regarding forfeiture. St. Paul then issued a bond without obtaining the official version of the TRO. IAL posted the bond with the court and flew the plane with the engine attached on May 22, 1991 to Miami, Florida.
 
 
 8
 IAL claims that it had difficulty obtaining a "hard stand" in Miami, which was needed to transport the engine safely back to Tucson. According to IAL, this delay caused it to miss the June 3 deadline for the return of the engine. On June 3, IAL moved for an extension of the deadline. The state court extended the deadline until June 5, 1991. IAL finally shipped the engine without the rear support recommended by the manufacturer. The engine arrived on June 5, 1991, allegedly damaged and with parts missing.
 
 
 9
 Mercury claims that while the engine was in Miami, IAL "cannibalized" it by removing parts and installing them on other aircraft. Mercury also claims that shipping the engine without the rear support requires an expensive inspection before the engine can be flown again. Moreover, Mercury claims that IAL failed to comply with other manufacturer's instructions, which resulted in loose parts damaging the engine during shipping.
 
 
 10
 IAL moved for another extension of time to comply with the TRO to replace the missing parts on June 5, 1991. On June 6, IAL removed the proceedings to the United States District Court for the District of Arizona. The district court had diversity jurisdiction over the suit.
 
 
 11
 On June 24, Mercury filed its opposition to IAL's motion to extend time, and moved for forfeiture of the bond. On July 19, IAL moved to dissolve the TRO, asserting that it was improperly granted. On August 22, 1991, the district court denied IAL's motion to extend time and to dissolve the TRO, and granted Mercury's motion for forfeiture of the bond.
 
 
 12
 St. Paul refused to forfeit the bond, arguing that the bond on its face did not cover the risk of forfeiture. Mercury moved against St. Paul pursuant to Rule 65.1 of the Federal Rules of Civil Procedure to enforce liability under the bond. IAL then moved for reconsideration of the district court's order. St. Paul opposed Mercury's motion to enforce liability under the bond, and cross-moved for reconsideration and a new trial.
 
 
 13
 On November 14, 1991, the district court entered an order denying both IAL's and St. Paul's motions. IAL and St. Paul appeal.
 
 II
 
 14
 IAL contends that the state court did not have subject matter jurisdiction to enter the TRO. IAL concedes that the state court had subject matter jurisdiction over the underlying dispute after the bankruptcy court abandoned the engine to the creditors under 11 U.S.C. § 554(a) (1988). IAL argues, however, that the state court lacked the jurisdiction to enter the particular remedy at issue here. IAL's challenge to the remedy is improperly framed as a jurisdictional question. The state court exercised its jurisdiction over a dispute properly before it; it did not need a separate grant of jurisdiction to enter the TRO. See First Nat'l Bank & Trust Co. v. Pomona Mach. Co., 486 P.2d 184, 185 (Ariz.1971) ("Jurisdiction over the subject matter--the underlying obligation-- ... is the power to hear and determine cases of the general class to which the particular proceedings belong...."); see also Virgin Islands v. Sun Island Car Rentals, 819 F.2d 430, 431 (3d Cir.1987) (the nature of the relief sought does not determine whether there is subject matter jurisdiction); Old Security Life Ins. Co. v. Continental Illinois Nat'l Bank & Trust Co., 740 F.2d 1384, 1395 (7th Cir.1984) (same). Thus, we reject IAL's contention.
 
 III
 
 15
 and
 
 
 16
 IAL argues that the TRO was improperly issued because it modifies the bankruptcy court abandonment order in two ways. First, the TRO allows IAL to fly the engine; this was prohibited by the abandonment order. Second, the TRO limits IAL's use of the QEC; the abandonment order expressly declined to determine the rights in the QEC.
 
 
 17
 On the latter point, the TRO and the abandonment order are simply not in conflict: the TRO merely restricted rights which were not established in the abandonment order. On the former point, the district court found that IAL was judicially estopped from arguing that the TRO improperly authorized it to fly the engine, a position which was inconsistent with IAL's earlier position that modification of the TRO to allow it to fly the engine was proper.
 
 
 18
 Under the doctrine of judicial estoppel,
 
 
 19
 a plaintiff who has obtained relief from an adversary by asserting ... one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention.
 
 
 20
 Estate of Cohen, 464 P.2d 620, 623-24 (Ariz.App.1970). In this case, IAL earlier took the position that it was proper to modify the TRO to allow IAL to post a redelivery bond and fly the engine. Now that IAL has obtained the benefit of this position--by taking advantage of a leasing opportunity in Miami--it is barred under the doctrine of judicial estoppel from asserting that the TRO is improper in this respect.
 
 
 21
 IAL sets out three reasons why judicial estoppel should not apply. First, it argues that it did not consent to the TRO. Even if true, this is irrelevant. It is IAL's argument for the modification of the abandonment order which bars its present argument, not its position with respect to the TRO as a whole. Second, IAL argues that judicial estoppel is available in a second lawsuit only after a prior lawsuit has resulted in a judgment. This rule of Arizona law, see Sales v. Jones, 499 P.2d 721, 726 (Ariz.App.1972), is not applicable in the present context of inconsistent assertions in the same proceeding. Third, IAL argues that judicial estoppel applies only to assertions of fact. This argument is unavailing because the earlier position taken by IAL is essentially factual--that is, that the abandonment order, which was a stipulated order between the parties, was intended to be temporary in nature and that the TRO therefore does not conflict with it.
 
 B
 
 22
 IAL also argues that entry of the TRO was improper because Mercury had the adequate legal remedy of replevin. Although Mercury sought replevin in its original state court complaint, this remedy did not remain adequate when Mercury learned that IAL was intending to fly the engine without notice to Mercury.
 
 
 23
 The cases cited by IAL all involve situations in which a party lawfully in possession of an object was attempting to move the object, and a court found that replevin, rather than an injunction, was the appropriate remedy for a party seeking to prevent that action. See Aver v. General Dynamics Corp., 625 P.2d 913 (Ariz.App.1980) (attempt by replevinor to move aircraft must be opposed by replevin rather than injunction); Cloeter v. Superior Court, 347 P.2d 33 (Ariz.1959); Valley Drive-In Theatre Corp. v. Superior Court, 291 P.2d 213 (Ariz.1955). The crucial distinction in this case is that the party in possession (IAL) had no right to remove the engine, because the abandonment order already forbade that action.
 
 IV
 
 24
 IAL argues that it was not bound by the terms of the restraining order because the order expired on June 1, 1991. Under Arizona Rule of Civil Procedure 65, TROs expire ten days after they are issued. Rule 65 provides, however, that a TRO can be extended with the consent of the parties. Here, IAL voluntarily posted the bond, knowing that doing so would extend the term of the restraining order. Moreover, IAL was unable to return the plane within the extended term provided for in the order, and actually sought an extension. By voluntarily consenting to the bond, and later requesting a further extension, IAL consented to the extension of time for the TRO.
 
 V
 
 25
 IAL and St. Paul argue that (1) the bond does not cover the risk of forfeiture and (2) even if the bond does cover the risk of forfeiture, ordering forfeiture under these circumstances would amount to an improper penalty for non-compliance with the TRO.
 
 
 26
 There is no forfeiture provision in the bond itself. St. Paul argues that under Arizona contract law, the district court would first have to find as a matter of law that the bond is ambiguous on its face before the forfeiture provision of the TRO could be read into the bond. St. Paul further argues that the bond unambiguously limits its liability to damages.
 
 
 27
 We conclude that St. Paul's argument is without merit. A court need not find an ambiguity in the language of a bond issued pursuant to a court order before the terms of the court order are read into the bond. It is well-settled that "[a] surety's obligation is determined by the language of the bond, the rule requiring the giving of the bond, and the terms of the injunction or other order requiring the posting of the bond." 5A Federal Procedure, L.Ed. § 10:12 (1991); accord Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2973 at 652-53 (liability of a surety is governed "by the conditions expressed in the surety agreement or in the order of the court that required the posting"); Martin v. Clarke, 105 F.2d 685, 687 (7th Cir.1939) ("[t]he bond must be read in light of the law, the procedure and the order which directed it to be made, and in view of the purpose to be served"); cf. Tanner Cos. v. Insurance Marketing Servs., Inc., 743 P.2d 951 (Ariz.App.1987) (if a bond is required by a statute, the statute will be read into the bond). Reading the bond in light of the TRO, it is clear that the bond covers the risk of forfeiture.
 
 
 28
 IAL and St. Paul argue that even if the bond by its terms covers the risk of forfeiture, ordering forfeiture in this situation amounts to an improper penalty against IAL. We reject this contention. Despite Mercury's vigorous objections, IAL induced the district court to allow it to fly the engine upon the posting of the bond. By posting the bond and flying the engine, IAL agreed to the forfeiture provision. IAL received the benefits of the district court's willingness to accommodate its wishes; it cannot now escape the attendant burdens.
 
 
 29
 IAL argues that the engine was worth nowhere near $1.5 million and thus Mercury received a windfall when the court ordered the forfeiture of the bond. This contention, however, is belied by IAL's willingness to post the bond in order to use the engine. Likewise, because the bond covers the risk of forfeiture, we reject IAL's contention that the district court improperly ordered forfeiture without proof of damages. A valid forfeiture necessarily implies that proof of actual damages is not required.
 
 
 30
 St. Paul argues that the forfeiture provision should be struck down as violative of public policy. In making this argument, St. Paul invites us to apply contract principles to the interpretation of a court order. We decline the invitation. The policies behind the prohibitions on liquidated damages clauses or other forfeiture provisions in contracts between private parties simply do not apply in the context of a court order.
 
 
 31
 IAL also argues that Mercury has a security interest in the engine but not in the QEC. Therefore, IAL maintains, it was improper for the district court to order forfeiture for IAL's failure to return part of the QEC. This argument fails because it is irrelevant whether Mercury had a security interest in the QEC. The TRO and the redelivery bond both expressly refer to the QEC. The promise to return the QEC was part of the deal that IAL entered in order to obtain the right to fly the engine.
 
 
 32
 We conclude that the district court properly ordered forfeiture of the bond.
 
 VI
 
 33
 and
 
 
 34
 St. Paul argues that section 12-1641 of the Arizona Revised Statutes provides a defense to payment. We reject this argument. Section 12-1641 applies, by its own terms, only to bonds issued pursuant to contracts. The defense does not apply here.
 
 
 35
 St. Paul further urges us to hold that section 12-1646 of the Arizona Revised Statutes extends section 12-1641 to all actions involving sureties. We decline to do so. Section 12-1646 merely broadens the definition of "surety"; it does nothing to broaden the type of action to which section 12-1641 applies.
 
 B
 
 36
 St. Paul also argues that it did not know that the bond it issued was subject to forfeiture. St. Paul apparently issued the bond based on an unsigned copy of the May 21, 1992 TRO, which did not include the forfeiture provision of the May 22, 1992 TRO. The district court found that "St. Paul was misled by [IAL] in issuing its bond." St. Paul argues that it should not be bound because it did not intend for the bond to cover the risk of forfeiture.
 
 
 37
 The district court concluded that whether or not St. Paul had actual notice of the terms of the TRO, it had a duty to inquire about the facts underlying its risk and is therefore liable for forfeiture of the bond. We agree. See Rhode Island Recreational Bldg. Auth. v. Industrial Nat'l Bank, 494 A.2d 537, 540 (R.I.1985) ("there is a duty incumbent on the surety 'not [to] rest supine, close his eyes, and fail to seek important information within his reach' ") (citing Magee v. Manhattan Life Ins. Co., 92 U.S. 93, 98 (1876)); Sumitomo Bank v. Iwasaki, 73 Cal.Rptr. 564, 559 (Cal.1968) ("Particularly in those cases in which the surety assumes the risk at the debtor's request, rather than the creditor's, the creditor may reasonably assume that the surety will acquire from the debtor himself all information which it reasonably believes is relevant to the risk."). This rule extends to cases where the surety's lack of notice is due to the fraud of the debtor. See Pierce v. Wright, 336 P.2d 1049, 1057 (Cal.App.1953) ("The rule is well settled and generally followed that fraud of the principal debtor will not relieve the guarantor or surety who acted at the request of the debtor from liability, if the creditor did not have notice of the fraud and did not participate therein.").
 
 
 38
 Thus, although St. Paul may not have contemplated the risk of forfeiture, the district court was correct in concluding that it should be found liable for the full amount of the bond.
 
 C
 
 39
 St. Paul also argues that section 124(1) of the Restatement of Security provides a defense of discharge.
 
 Section 124(1) provides:
 
 40
 Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.
 
 
 41
 (emphasis added); see Georgia-Pacific Corp. v. Levitz, 716 P.2d 1057, 1059 (Ariz.App.1986) (applying section 124). St. Paul alleges that Mercury had reason to believe that St. Paul had relied on the improper TRO in issuing the bond, and thus its failure to communicate the information to St. Paul relieves St. Paul of liability. However, the district court found that Mercury had no reason to know that St. Paul was unaware of the forfeiture provision in the TRO, and thus had no duty toward St. Paul. That finding was not clearly erroneous.
 
 
 42
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3